IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:20-CR-203-12 |
| | ) | |
| BRANDON JEFFERSON POTTS | ) | |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Before the court is Defendant Brandon Jefferson Potts's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). (Doc. 409.) The Government has responded in opposition to Potts's pro se motion. (Doc. 418.) The court subsequently appointed counsel to represent Potts for this motion (Doc. 438), and through counsel, Potts has filed a reply and additional medical records (Docs. 448-451). For the reasons set forth below, the motion for compassionate release will be granted.

## I.   BACKGROUND

On October 7, 2020, Potts pleaded guilty to conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). (Doc. 279.) On March 10, 2021, Potts was sentenced to 146 months of imprisonment followed by five years of supervised release. (Id.) His presumptive release date is April 16, 2029. Fed. Bureau of Prisons, Find an Inmate, at https://www.bop.gov/inmateloc. He is 38 years old and is currently incarcerated at FMC Butner. Id.

Potts filed the present motion on September 21, 2023. (Doc. 409.) Principally, he argues that his diagnosis of melanoma and inadequate care by the Bureau of Prisons ("BOP"), including a months-long delay in the notification of his biopsy results, constitute extraordinary and compelling reasons for a sentence reduction. The Government contends that Potts is receiving specialized care at FMC Butner and that he is otherwise sustaining self-care. (Doc. 418.)

## II. ANALYSIS

### A. Standard of Review

"Federal law has long authorized courts to reduce the sentences of federal prisoners facing extraordinary health conditions," but prior to the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, district courts could grant such reductions only upon a motion by the Director of the Bureau of Prisons ("BOP") pursuant to 18 U.S.C. § 3582(c)(1). United States v. Beck, 425 F. Supp. 3d 573, 577-78 (M.D.N.C. 2019). However, Congress amended section 3582(c)(1) when it passed the First Step Act. Pertinent here, the First Step Act added a provision to section 3582(c)(1) that allows a defendant to bring a motion for compassionate release directly in a district court after either "the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of

2

such a request by the warden of the defendant's facility, whichever is earlier."   18 U.S.C. § 3582(c)(1)(A).

Once the exhaustion requirement is met, a defendant must either (1) have "extraordinary and compelling reasons" for a compassionate release or (2) be at least 70 years old, have served at least 30 years in prison, and have the Director of the BOP determine that the defendant is not a danger to the public.  Id. The defendant bears the burden of establishing that extraordinary and compelling reasons justify his release.  See United States v. Newton, 996 F.3d 485, 488 (7th Cir. 2021); see, e.g., United States v. Hargrove, 30 F.4th 189, 195 (4th Cir. 2022).  Further, while a court need not address every argument raised by a defendant, it must fully explain its decision in light of the particular circumstances of each case.  United States v. Osman, No. 21-7150, 2022 WL 485183, at *2 (4th Cir. Feb. 17, 2022) (per curiam) (unpublished)[1] (citing United States v. High, 997 F.3d 181, 188-89 (4th Cir. 2021)).  Additionally, a court, in considering a reduction in sentence pursuant to section 3582(c)(1)(A), must consult the sentencing factors set forth in 18 U.S.C. § 3553(a) and may grant the reduction only if it is "consistent with [the] applicable policy statements" issued by the United States

---

[1] Unpublished opinions of the Fourth Circuit are not precedential but can be cited for their persuasive, but not controlling, authority.  See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

3

Sentencing Commission.  18 U.S.C. § 3582(c)(1)(A).

As recently amended,[2] United States Sentencing Guideline section 1B1.13(a) essentially reiterates the requirements of section 3582(c)(1)(A), with the additional requirement that a defendant not be "a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(a)(2); see also Beck, 425 F. Supp. 3d at 578.  Section 1B1.13(b) then provides a non-exhaustive list of examples of extraordinary and compelling reasons to grant a compassionate release.  The four enumerated reasons are (1) medical circumstances of the defendant; (2) age of the defendant; (3) family circumstances of the defendant; and (4) defendant as a victim of abuse.  U.S.S.G. § 1B1.13(b).  Section 1B1.13(b)(5) then provides a catch-all for "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through

---

[2] The U.S. Sentencing Guidelines require the court to use the manual in effect unless doing so would present an ex post facto issue.  See U.S.S.G. § 1B1.11(b)(1)-(2) (barring the use of the manual in effect on the date of sentencing if it would violate the ex post facto clause, and requiring application of manual "in its entirety"); United States v. Davis, 99 F.4th 647, 658 (4th Cir. 2024) (suggesting that district court must consider new amendments on remand even though motion was filed before amendments were promulgated); United States v. Curtin, Crim. No. 14-0467, 2023 WL 8258025, at *2 (D. Md. Nov. 29, 2023) (using manual no longer in effect because, in that particular case, the amendments "narrow[] the range of possible extraordinary and compelling reasons").  The court applies the 2023 manual here, as it provides for equal, if not greater, avenues for relief for medical circumstances than the 2021 manual.

4

(4)."  Section 1B1.13(b)(6) also provides that a court may consider a change in the law when determining "whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances."  Finally, section 1B1.13(d) states that rehabilitation of the defendant is not alone an extraordinary and compelling reason, but it may be considered along with other circumstances.

Courts maintain broad discretion in the evidence they may consider on a motion to reduce a sentence under the First Step Act.  Concepcion v. United States, 142 S. Ct. 2389, 2403-04 (2022).  However, courts do not have unfettered jurisdiction or discretion to modify criminal sentences.  See United States v. Goodwyn, 596 F.3d 233, 235 (4th Cir. 2010) ("The law closely guards the finality of criminal sentences against judicial change of heart.") (internal quotations omitted).  A court may modify a sentence only when a provision in the Federal Rules of Criminal Procedure or a statute, such as 18 U.S.C. § 3582(c), expressly permits it to do so.  Even then, section 3582(c) is appropriately invoked only in unusual cases, or, as the Fourth Circuit phrases it, the "most grievous cases."  United States v. McCoy, 981 F.3d 271, 287 (4th Cir. 2020); see Osman v. United States, Crim. No. 2:10-cr-57-5,

Case 1:20-cr-00203-TDS   Document 452   Filed 08/22/24   Page 5 of 22

2023 WL 3765246, at *4 (E.D. Va. June 1, 2023) ("The Senate Judiciary Committee report on the Sentencing Reform Act explained that compassionate release would address 'unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances.'" (citations omitted)). It is not a vehicle for repeated reconsideration of sentences as a way to circumvent the general rule of finality. See Goodwyn, 596 F.3d at 235-36. Nor is it a vehicle to collaterally attack a federal conviction or sentence. United States v. Ferguson, 55 F.4th 262, 270 (4th Cir. 2022).

## B. Exhaustion

The Government concedes that Potts has satisfied the exhaustion requirement. (Doc. 418 at 4 n.3.) The court thus turns to the merits.

## C. Potts's Motion

### 1. Medical Conditions and Treatment History

Potts argues that his medical condition, namely his stage III[3] melanoma, as well as delays in the BOP's treatment of it, constitute grounds for a reduction in sentence. (Doc. 409 at 4.) He also notes as additional conditions warranting early release, "extreme stress, anxiety, depression, sleep apnea, other sleeping

---

[3] Potts states that he has been diagnosed with stage IV melanoma. As discussed below, his medical records do not support this end-stage diagnosis.

complications, abdominal pain, and other pains triggered from the spreading of the cancer."  (Id.)

Melanoma is considered to be "among the most serious forms of skin cancer."  Memorial Sloan Kettering Cancer Center, Melanoma, at https://www.mskcc.org/cancer-care/types/melanoma (last accessed Aug. 19, 2024).  There five stages of melanoma from zero (early stage) to four (late stage).  Id.  Melanoma is highly treatable in the early stages but becomes increasingly complicated to treat when it metastasizes to nearby lymph nodes.  Memorial Sloan Kettering Cancer Center, Melanoma Stages 0, 1, 2, 3, and 4, at https://www.mskcc.org/cancer-care/types/melanoma/diagnosis/melanoma-stages (last accessed Aug. 19, 2024); see also American Cancer Society, Survival Rates for Melanoma Skin Cancer, at https://www.cancer.org/cancer/types/melanoma-skin-cancer/detection-diagnosis-staging/survival-rates-for-melanoma-skin-cancer-by-stage.html (last accessed Aug. 19, 2024).

Delays in detection and treatment, especially in the early stages of the disease, can reduce an individual's chances of survival.  See Ruzica Z. Conic et al., Determination of the Impact of Melanoma Surgical Timing on Survival Using the National Cancer Database, 78 J. Am. Acad. Dermatology 40, 40-46 (Oct. 17, 2017).  Stage I melanoma patients have been found to have an increasingly higher risk of mortality when treated beyond 30 days of biopsy.

7

Id.  Treatment delays of three to five months for stage I melanoma patients and six or more months for stage II melanoma patients have been found to be associated with worse melanoma-specific mortality.  David D. Xiong et al., Delays in the Surgical Treatment of Melanoma are Associated with Worsened Overall and Melanoma-Specific Mortality: A Population-Based Analysis, 87 J. Am. Acad. Dermatology, 807, 807-814 (June 30, 2022).

Until at least May 25, 2021, Potts had no reported history or symptoms of carcinoma or lymphoma.  (Doc. 448-1 at 3, 8, 18.)  On June 21, 2022, Potts was seen by a nurse at FCI Edgefield, who explained:

> Inmate appears in medical with two black lesions. One on his front left shoulder and the other on his belly button. Stated they started about a year ago the size of a freckly [sic] but recently started increasing in size. Black in color. Scabs off in small pieces. Denies pain but does complain of constant itching. Encouraged commissary meds for now. Aox3. VS stable. Ambulates independently. Will refer to provider for follow up.

(Doc. 448-2 at 5.)  At the follow up seven weeks later on August 9, 2022, Potts reported that the lesion was "30 times larger compare[d] to a year ago." (Id. at 1.)  A dermatology consultation was requested with "routine" priority and a target date of September 8, 2022. (Id.)

The next relevant treatment is dated December 27, 2022 — i.e., nearly five months later — when a provider outside of the BOP performed a shave-biopsy on the front of Potts's left shoulder,

8

where there was a "suspicious irregular multicolored papule," in order to "rule out melanoma." (Doc. 419 at 218.) The biopsy revealed that Potts indeed had "invasive melanoma." (Id.) The medical report states that the melanoma had a Breslow thickness of 2.1 mm with ulceration. (Id.); see Melanoma Stages 0, 1, 2, 3, and 4, supra. The pathological staging was listed as "PT3B," which, according to the Melanoma Research Alliance, corresponds to at least stage II melanoma. (Doc. 419 at 218); Melanoma Research Alliance, Understanding Melanoma Staging, at https://www.curemelanoma.org/about-melanoma/melanoma-staging/understanding-melanoma-staging (last accessed Aug. 19, 2024) (noting that T3B tumor would indicate stage III melanoma if it occurred with metastasis).

Following this biopsy, Potts's outside provider wrote to the attention of the medical department at FCI Edgefield on January 6, 2023, and again on January 18, 2023:

> Patient will need surgical oncology referral possible to check nodes/chemo tx. can send to AU or Dr Yeh (Piedmont) or MUSC if they don't have anyone to send to. should see oncology as well for possible biologic treatment . ASAP

(Doc. 419 at 220-21 (text without alteration).) Potts claims in his motion that he was never told of his diagnosis by anyone at FCI Edgefield. (Doc. 409 at 7.) He states that he asked about the biopsy's results and was told that "if he was not notified of the results then it means the results were good." (Id.) This is

9

corroborated by the lack of any treatment notes in his medical records between the biopsy and his transfer to USP Atlanta on May 10, 2023, and by Potts's request at USP Atlanta on June 23, 2023, that stated:

> I have a spot on my left shoulder that biopsied at my prior location in Edgefield, SC. I was transferred before I knew the results. I need to have this examined as soon as possible because it bleeds regularly and is very painful. It has not healed at all, only gotten worse. Thank you.

(Doc. 419 at 210; see also id. at 74 (noting June 26, 2023 follow-up to request where provider wrote that Potts stated he was not informed of the diagnosis of the December 2022 biopsy).) The Government concedes that the FCI Edgefield medical team did not provide any cancer treatment and does not contest that Potts was not informed of his diagnosis for over six months. (Doc. 418 at 8-9.)

At Potts's first health services visit at USP Atlanta on June 26, 2023, Potts stated that he "noticed visible changes to the left upper chest lesion, including pain, increased size, and intermittent swelling and bleeding." (Doc. 419 at 74.) He also noted a "less extensive" lesion on his umbilicus. (Id.) He said that he experienced headaches despite rest and over-the-counter analgesics, but otherwise felt well. (Id.) Health services at USP Atlanta then requested an urgent request for an MRI of the brain, a CT scan of the chest, abdomen, and pelvis, and a

10

consultation with surgical oncology.  (Id. at 71.)

The imaging of the brain, which occurred on July 18, 2023, returned as "normal."  (Id. at 205.)  The CT scan that same day showed "no evidence of intrathoracic or intrabdominal metastatic disease."  (Id. at 206.)  On August 9, 2023, Potts had a positron emission tomography CT ("PET CT") of the whole body, which found:

> 1. Intensely hypermetabolic skin lesion within the left anterior chest wall, consistent with known primary malignancy.
>
> 2. Hypermetabolic bilateral axillary lymph nodes are concerning for nodal metastatic disease.
>
> 3. Hypermetabolic lesion in the left distal femur, concerning for metastatic disease. Further evaluation with MRI may be helpful.

(Id. at 61); see also Mayo Clinic, Positron Emission Tomography Scan, at https://www.mayoclinic.org/tests-procedures/pet-scan/about/pac-20385078 (last accessed Aug. 19, 2024).

On September 29, 2023, Potts had a "full skin and [lymph node] exam."  (Id. at 179.)  The provider wrote in her treatment notes,

> There has been a major delay in treatment since diagnosis at the outside facility.  In the interim, the lesion has grown, per patient.

(Id.)  The provider confirmed the left shoulder lesion and noted that "the rest of the head-to-toe skin exam was negative for additional concerning lesions."  (Id.)  The provider wrote that

11

Potts would undergo an ultrasound-guided fine needle aspiration[4] ("FNA") of the left axillary (armpit) lymph nodes to inform if immunotherapy would be beneficial. (Id.)

On October 3, 2023, the FNA revealed malignant cells in Potts's left axillary lymph nodes. (Id. at 174.) Potts was accordingly diagnosed with stage III metastatic malignant melanoma. (Id. at 164.) On October 27, 2023, his outside provider planned for Potts to proceed with "neoadjuvant pembro[lizumab]," i.e., an immunotherapy. (Id. at 166.) Potts received his first infusion on November 11, 2023, and was scheduled to have the second and third infusions in three and six weeks, respectively. (Id. at 41.)[5]

On November 21, 2023, Potts was transferred to FMC Butner "for treatment for malignant melanoma to left chest wall." (Id. at 38.) Potts began a different immunotherapy – i.e., a combination of Yervoy and Opdivo – which also are administered every three weeks. (Id. at 28.) On December 6, 2023, a provider at FMC Butner administered the first infusion. (Doc. 445 at 180.)

---

[4] Stanford Medicine Health Care, Ultrasound Fine Needle Aspiration Biopsy, https://stanfordhealthcare.org/medical-tests/u/ultrasound-fine-needle-aspiration-biopsy.html (last accessed Aug. 19, 2024).

[5] Potts received Keytruda, also known as pembrolizumab, one of "[t]hree checkpoint inhibitor drugs [that] are currently available to treat advanced melanoma." Memorial Sloan Kettering Cancer Center, Immunotherapy for Melanoma, at https://www.mskcc.org/cancer-care/types/melanoma/treatment/immunotherapy-melanoma (last accessed Aug. 19, 2024).

By mid-January, Potts was experiencing such severe side effects from the immunotherapy — including diarrhea, inability to keep food down, and severe abdominal pain treated with oxycodone — that he was hospitalized and his immunotherapy was paused. (Id. at 92-163.) His weight dropped from 142 pounds to 122 pounds in this span of weeks. (Id. at 87, 174.)

Over the subsequent months, Potts continued treatment. On March 21, 2024, he had an excision of his left anterior shoulder melanoma, a left axillary lymph node dissection, and an excisional biopsy of the umbilicus lesion at Duke Cancer Center. (Id. at 62, 332.) This revealed "evidence of a significant, though partial response to immunotherapy." (Id. at 328.) By early May, Potts's side effects had stabilized to allow for immunotherapy again, and he appears to have tolerated it well for several weeks through mid-June. (Id. at 1-19, 400-01.)

On July 8, 2024, Potts had another PET/CT scan which revealed the following:

> Bilateral posterior submandibular lymph nodes are mildly enlarged and new compared to 01/03/2024 PET/CT exam. These nodes are moderately FDG avid, max SUV 5.7 on the left and 5.4 on the right. A node posterior to the right internal jugular vein at the level of the hyoid bone has max SUV 2.9 and is also slightly enlarged compared to prior study.

(Doc. 449-1 at 57.) On July 22, 2024, Potts's Keytruda treatment was paused due to side effects, and he began treatment with Dabrafenib and Trametinib on August 5, 2024. (Id. at 11.)

13

On August 11, 2024, Potts had a "syncopal episode."  (Id. at 1.)  Upon transfer to the emergency room, he was reportedly "unable to coherently speak" and "nearly collapsed" upon standing.  (Doc. 450-1 at 19.)  He reported weakness, nausea, vomiting, and sharp pain while urinating.  (Id. at 7.)  He was diagnosed with sepsis, and his provider noted that Dabrafenib and Trametinib "may be contributing" to the symptoms.  (Id. at 1.)  As of the date of Potts's reply brief, he remained hospitalized.  (Doc. 451 at 7.)

### 2.  Extraordinary and Compelling Reasons

Under the U.S. Sentencing Guidelines, a defendant may demonstrate extraordinary and compelling reasons for a sentence reduction where he or she is suffering from a terminal illness, such as metastatic solid-tumor cancer, U.S.S.G. § 1B1.13(b)(1), or where the defendant "presents any other circumstance or combination of circumstances" that are "similar in gravity" to the other reasons listed in section 1B1.13(b), U.S.S.G. § 1B1.13(b)(5).  As Potts correctly observes, many courts have recognized that "unwarranted delay by BOP in the diagnosis and treatment of an inmate's serious medical conditions could constitute, or contribute to, extraordinary and compelling reasons for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i)."  (Doc. 451 at 17.)  For example, in Beck, BOP failed to provide timely treatment for the defendant's breast cancer.  425 F. Supp. 3d at 581.  The defendant endured an eight-month delay between

14

imaging suggesting she had cancer and BOP providing a biopsy that confirmed the diagnosis. Id. The BOP then delayed another two months before taking the defendant for surgery, by which time the cancer had metastasized to her lymph nodes and required a "radical mastectomy." Id.; see also United States v. Bell, No. 3:19-CR-66, 2023 WL 8890940 (D. Ak. Dec. 26, 2023) (lung cancer); United States v. Derentz, 608 F. Supp. 3d 189 (E.D. Pa. 2022) (detached retina); United States v. Burr, No. 1:15-CR-362-1, 2022 WL 17357233 (M.D.N.C. Dec. 1, 2022) (multiple conditions); United States v. McPeek, No. 19-CR-40003, 2022 WL 429249 (N.D. Iowa Feb. 11, 2022) (prostate cancer); United States v. Smith, 464 F. Supp. 3d 1009 (M.D. Iowa 2020) (lung cancer).

Beck described BOP's delays in treatment as "abysmal." Beck, 425 F. Supp. 3d at 581. Sadly, Potts's situation is similar. While BOP surely faces difficulties in managing a detention population, inordinate delays in critical medical care, such as in this case, cannot be excused. In the face of tell-tale (and worsening) symptoms of melanoma beginning in June 2022, BOP waited over six months to provide Potts a biopsy in December 2022. When that biopsy confirmed a diagnosis of melanoma in early January 2023, BOP providers at FCI Edgefield inexplicably failed to inform Potts of that diagnosis, despite two urgent requests from his outside provider for Potts to pursue oncological care "ASAP." (Doc. 419 at 220-21.) Potts only learned the results of the biopsy

15

in June 2023, after his transfer to USP Atlanta, when he personally and specifically sought out the results. (Id. at 210.) Still, further months passed before Potts received a fine needle aspiration biopsy which confirmed that the cancer had by then metastasized to his left axillary lymph nodes. (Id. at 174.) As the above summary of his records demonstrate, his treatment since his stage III diagnosis has led to partial progress, but not without intolerable side effects from the immunotherapy that have required Potts to periodically pause treatment.

As Potts points out, it is virtually impossible for the court to ascertain that his progression to stage III melanoma was caused by the BOP's delays in informing him of the melanoma diagnosis and providing appropriate treatment. (Doc. 451 at 12-13.) Indeed, the court cannot know the staging of Potts's melanoma when he first reported visible and concerning symptoms in June 2022. (Doc. 448-1 at 5.) Crucially, however, the sole reason the court cannot know these things is because BOP failed to provide essential medical care to Potts. What can be said, as demonstrated by the medical research cited by the parties, is that Potts's chances of survival have likely been significantly reduced by the BOP's failures. Moreover, while the Government stands behind the BOP's current treatment of Potts (Doc. 444), and while the court has no basis to question Potts's current treatment plan, it is probable that Potts has reduced odds for remission and has endured far more

16

taxing treatment than would otherwise be required if BOP had acted timely.  See Melanoma Stages 0, 1, 2, 3, and 4, supra.

While a defendant is responsible for his own conduct that leads to imprisonment, it is incumbent on prison officials to provide all proper and necessary medical care.  Brown v. Plata, 563 U.S. 493, 511 (2011) ("A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.").  BOP has failed to do so here.  As a consequence, and given Potts's stage III melanoma diagnosis, the court concludes that Potts has demonstrated extraordinary and compelling reasons for a reduction in sentence under U.S.S.G. §§ 1B1.13(b)(1) and (5).[6]

### 3.  Section 3553(a) Factors

Even where a defendant demonstrates an extraordinary and compelling reason, the court still must consider whether a reduction in sentence is justified in light of the factors set forth in 18 U.S.C. § 3553(a).  18 U.S.C. § 3582(c)(1)(A).  Section 3553(a) requires a court to impose a sentence that is "sufficient,

---

[6] It is unclear whether BOP's failures as to Potts are the product of institutional problems, which are well-documented, or individual inaction.  See, e.g., Dep't of Justice, Off. of Inspector Gen., Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions (Feb. 2024), at https://www.oversight.gov/sites/default/files/oig-reports/DOJ/24-041.pdf (last accessed Aug. 19, 2024).  Nothing in this court's opinion is meant to attribute responsibility to any one individual involved.

17

but not greater than necessary" to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a). Importantly, the "text of § 3553(a) does not make any factor, or combination of factors, dispositive." Kibble, 992 F.3d at 334-35 (Gregory, C.J., concurring). Thus, the court must consider ─—

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence[s] and the sentencing range established for [the applicable offense category as set forth in the guidelines] . . .;
>
> (5) any pertinent policy statement . . . by the Sentencing Commission . . .;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Here, Potts engaged in a serious offense, namely conspiracy to distribute methamphetamine. (Doc. 239 ¶ 20.) Potts's participation was related to feeding his personal drug habit and involved transporting and selling methamphetamine purchased and distributed by others. (Id. ¶ 26.) When law enforcement conducted a traffic stop of the vehicle he and his cousin, Tiffany Ann Potts, were in, a K-9 detected the odor of narcotics. (Id. ¶ 40.) Upon search of the vehicle, officers found methamphetamine under, as well as a handgun in the pocket in front of, the seat in which Tiffany was sitting. (Id.) Potts picked up ten ounces of methamphetamine every other day over a four-month period, some which he sold himself and held for another. (Id. ¶ 42.) He was held responsible for a total of 17.01 kilograms of methamphetamine and 204.45 grams of methamphetamine (actual) (id. ¶ 47.)

Potts's criminal history is checkered but is largely distant and free of violent conduct. The most serious offense was in May 2014, when Potts was convicted of felony breaking and/or entering for breaking into a storage facility in Lexington, North Carolina. (Id. ¶ 71.) He received a suspended 7-to-18-month sentence and probation on April 16, 2015, and his supervision was revoked on January 7, 2016, for absconding supervision. (Id.) When re-released, Potts was reprimanded for failure to pay supervision fees and use of marijuana, but he completed supervision in December 2016. (Id.)

19

Potts's remaining criminal record includes misdemeanors, including a 2002 larceny at a Walmart and resisting a public officer (suspended sentence), a 2008 no operator's license ($10 fine), a 2010 no operator's license and simple possession of a schedule VI controlled substance ($50 fine), a 2011 possession of drug paraphernalia (1-day time-served sentence), a 2011 no operator's license ($50 fine), a 2012 larceny (45 days of imprisonment), and a 2014 financial card fraud (costs). (Id. ¶¶ 65-72.) Importantly, Potts has no prior convictions involving weapons or assaultive behavior, and his time served for the instant offense is already eight times the minimum of any previous sentence. While incarcerated, he has not had any disciplinary infractions, which is notable given his substance abuse history, as discussed below. (Doc. 418-2.)

As to his personal history and characteristics, Potts is now 38 years old. He completed the 10th grade, and he has a learning disability. (Doc. 239 ¶¶ 93 (listing IQ of 78), 101.) He grew up in a broken home and suffered physical abuse from his father. (Id. ¶ 82.) He reported abusing substances as early as his teenage years and began using methamphetamine at the age of 33. (Id. ¶¶ 95-97.) He stated, "I tried it, and it grabbed hold of me." (Id. ¶ 97.) He added, "When I started coming down, I went right back to it." (Id.) At the recommendation of the U.S. Probation Office, Potts's personal history and characteristics, as well as

his limited criminal history, counseled in favor of a significant downward variance when he was sentenced in this case. (Doc. 280 at 3.)

In view of the seriousness of his current cancer condition as well as the fact that he will remain under the supervision of the United States Probation Office for five years upon release, the court is satisfied that Potts will not present a danger to the community. (Doc. 279); U.S.S.G. § 1B1.13(a)(2). Further, having served more than 56 months in custody related to this offense, and given the serious and potentially life-limiting nature of his cancer diagnosis as well as the significant physical suffering he has been and will continue to be forced to endure as a likely result of the BOP's delayed diagnosis and treatment of his melanoma, a reduction in sentence to time-served adequately reflects the seriousness of the offense of conviction, his criminal history, and the need to protect the public.

#### 4. Release Plan

As he concedes, Potts has not proposed an adequate release plan, as required for any successful compassionate release motion under 28 C.F.R. § 571.61(a)(2). (Doc. 451 at 25.) A release plan must include "where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment."

21

28 C.F.R. § 571.61(a)(2). Under these circumstances, provision of adequate medical care for Potts's melanoma is of utmost importance. Accordingly, the court's order will be stayed to provide Potts time to propose a suitable release plan and the United States Probation Office time to review it as well as finalize any needed arrangements for him.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Potts's motion for compassionate release (Doc. 409) is GRANTED to the extent that his prison sentence will be reduced to time-served. Potts shall be subject to the terms of supervised release previously entered in his judgment (Doc. 279).

IT IS FURTHER ORDERED that this Order is STAYED pending this court's approval of a suitable release plan. Potts shall submit a proposed release plan forthwith, which shall be reviewed by the United States Probation Office. Upon this court's approval of a release plan, an Amended Judgment reflecting the court's ruling will be entered separately.

/s/    Thomas D. Schroeder
United States District Judge

August 22, 2024